E-FILED
Friday, 05 March, 2021  05:25:27 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS, URBANA DIVISION

| | | |
|---|---|---|
| BOBBY VINYARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS DEPARTMENT OF HUMAN | ) | JURY TRIAL DEMANDED |
| SERVICES and TAMMY NEMETH, in her | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Bobby Vinyard, by his counsel Equip for Equality, brings this action against the

Illinois Department of Human Services (IDHS) and Tammy Nemeth, in her individual capacity.

## INTRODUCTION

1.      This action concerns Defendants' discrimination against, failure to make

reasonable accommodations for, and denial of due process to Plaintiff Bobby Vinyard.

2.      Plaintiff became paralyzed by an accident when he was a teenager. He has

participated since 1990 in the Home Services Program, a Medicaid Home and Community Based

waiver program in Illinois that allows him to receive services in his own home, so that he may

continue to live in his community and avoid confinement in an institution.

3.      The Division of Rehabilitation Services (DRS), part of Defendant IDHS,

administers the Home Services Program. As with the State's other waiver programs, the purpose

of the Home Services Program is to "prevent the unnecessary institutionalization of individuals

who may instead be satisfactorily maintained at home at a lesser cost to the State." 89 Ill. Admin.

Code 676.10. *See also* the Rehabilitation of Persons with Disabilities Act, 20 ILCS 2405/3(f).

4.      In 2019, DRS suddenly terminated Plaintiff Vinyard's services under this program. It did so without giving him pre-deprivation notice and hearing, as required by statute as well as by federal constitutional procedural due process. The loss of services left Plaintiff socially isolated, put him in danger from lack of care, and left him at high risk of institutionalization. As set forth more fully below, Defendant Nemeth was personally involved in the decision-making leading to the deprivation of services.

5.      Through their conduct, Defendants violated Plaintiff's procedural due process rights, infringed on his right to live independently, and discriminated against him as a disabled person. This action seeks to remedy those violations and the resulting harms to Plaintiff.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' federal civil rights claims arise under the Rehabilitation Act, 29 U.S.C. § 794 (Section 504); the Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 18116 (Section 1557); Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132; the federal Medicaid Act (Title XIX of the Social Security Act); and the Fourteenth Amendment of the U.S. Constitution (as enforced under 42 U.S.C. § 1983).

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District and because a substantial part of the events or omissions giving rise to this claim occurred here.

## PARTIES

8.      Plaintiff Bobby Vinyard is a resident of Momence, Illinois. He has participated in the Home Services Program since 1990. Plaintiff Vinyard has quadriplegia. He is a qualified individual with a disability under the ADA, 42 U.S.C. § 12102(a), as well as the Rehabilitation

Act, 29 U.S.C. § 705(20), because he has a physical impairment that substantially limits him in one or more major life activities, including (without limitation) caring for oneself, performing manual tasks, walking, standing, lifting, bending, and removal of bodily wastes. He requires assistance with all activities of daily living. Plaintiff depends on the state's Home Services Program to continue to live in his own home and avoid unnecessary institutionalization. The state found him qualified for services under the Home Service Program starting in 1990.

9.      Defendant Illinois Department of Human Services (IDHS) is one of Illinois's largest executive agencies, whose mission is to streamline social services for Illinois residents, especially those who are challenged to maintain independence and self-sufficiency.

10.     Defendant Tammy Nemeth is a Public Service Administrator who works for IDHS. At all times relevant to this action, Defendant Nemeth directly oversaw Plaintiff's services on behalf of DRS and made determinations regarding Plaintiff's services within the Home Services Program. She resides, on information and belief, in Martinton, Illinois. She is sued in her individual capacity.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### The DRS Home Services Program

11.     Medicaid (codified at 42 U.S.C. § 1396 *et seq*.) is a joint federal-state program for medical assistance established under Title XIX of the Social Security Act. It provides necessary services to eligible beneficiaries. States that participate in Medicaid and comply with program guidelines receive federal funding to maintain beneficiary services. 42 U.S.C. § 1396a(a).

12.     As a state participating in Medicaid, Illinois has the option to serve Medicaid participants in their homes who would otherwise require institutionalization. 42 U.S.C. § 1396n(c)(1). Illinois uses several federally approved Home and Community-Based Services

waivers designed and implemented by the state Medicaid agency. DRS administers the Home

Services Program as one such Medicaid waiver program. 89 Ill. Admin. Code 676.10(b). Since

1990, except during his erroneous termination in 2019, Plaintiff used these services to live and

receive care in his own home, thereby avoiding institutionalization.

13.     To be eligible for the Home Services Program, an individual must, *inter alia*, have

a severe disability that is expected to last for at least twelve months or for the duration of life and

require or be in imminent risk of long-term care in an institutional setting, such as a nursing

home. *See* 89 Ill. Admin. Code 682.100. *See also* IDHS, "Empowering People with Disabilities,"

https://www.dhs.state.il.us/page.aspx?item=60122 (last visited on March 5, 2021).

14.     Under the Home Services Program, DRS has authority to determine the nature

and amounts of services that program participants receive. 20 ILCS 2405/3(f); 89 Ill. Admin.

Code 676.40. This includes deciding whether participants employ their own personal assistants

(self-directed care) or are instead assigned homemakers where DRS finds that self-directed care

is inappropriate or unavailable. *Id*. In general, participants who opt for self-directed care are free

to employ the personal assistants of their choosing. 89 Ill. Admin. Code 684.20(b).

15.     The federal Medicaid agency itself advocates for self-directed care: "Self-

direction promotes personal choice and control over the delivery of waiver and state plan

services, including who provides the services and how services are provided. For example,

participants are afforded the decision-making authority to recruit, hire, train and supervise the

individuals who furnish their services. The Centers for Medicare & Medicaid Services (CMS)

calls this 'employer authority.'" "Self-Directed Services," https://www.medicaid.gov/medicaid/

long-term-services-supports/self-directed-services/index.html (last visited on March 5, 2021).

16.     If the state determines that a person is ineligible for a Medicaid service, it must

provide the person due process as specified in the implementing regulations of 42 U.S.C.

§ 1396a(a)(3) and the constitutional requirements established in *Goldberg v. Kelly*, 397 U.S. 254

(1970). 42 C.F.R. Part 431, Subpart E; 42 C.F.R. § 435.916(a)(3)(i)(C). Those requirements

include the state's obligation to provide the person pre-deprivation notice of the termination of

coverage. The notice must inform the person of the reasons and of their right to contest the action

by requesting a fair hearing.  These procedures prevent unnecessary disruption of services.

17.     In cases involving the termination of a service, upon timely request by the

enrollee, the state must ensure that coverage is maintained pending disposition of the appeal. 42

C.F.R §§ 431.205, 431.211, 431.230; 42 C.F.R. §§ 435.905(b), 435.916(a)(3)(i)(C).

18.     The state must provide a fair hearing and render a decision within 90 days of

receipt of a timely request for appeal. 42 C.F.R. § 431.244.

<u>Plaintiff's Participation in the DRS Home Services Program</u>

19.     Plaintiff Vinyard experienced a spinal cord injury from an accident in May of 1987.

He has many complex and chronic conditions and care needs because of his spinal cord injury.

He has quadriplegia and is paralyzed from his shoulders down. He has no use of his fingers or

hands, very limited ability to move his arms, and no use of his legs. He is largely incontinent of

bladder and bowel, using a catheter which must be maintained by his caregivers. He must be

repositioned and cleaned regularly by his caregivers to avoid pressure sores. He is dependent

upon his caregivers for all his care needs and his essential activities of daily living.

20.     Plaintiff Vinyard has participated in the Home Services Program since 1990. For

over twenty years, he directed his own care and employed personal assistants at his discretion.

21.     In 2011, though, DRS abruptly terminated Plaintiff Vinyard's right to direct his

own care. Thus, Plaintiff could receive home services only from caregivers assigned to him by homemaker agencies that DRS approved.

22.     Plaintiff Vinyard repeatedly asked DRS to reinstate his right to self-directed care so that he could choose and manage his own personal assistants.

23.     Despite knowing that there were qualified individuals available to work as Plaintiff Vinyard's personal assistants, that Plaintiff was capable of managing his personal assistants according to Home Services Program requirements, and that this would allow Plaintiff to maintain home services, DRS still failed to reinstate Plaintiff's right to self-directed care.

24.     On or around June 29, 2018, DRS conducted a periodic reevaluation of Plaintiff Vinyard as a standard condition of his continued participation in the Home Services Program. From that evaluation, DRS again determined that Plaintiff was eligible for the program. It found that, although his need for care was great, Plaintiff could continue living independently in the community with the support of the Home Services Program.

25.     In its findings from this evaluation, DRS acknowledged that without home services, Plaintiff Vinyard was at high risk of physical harm, institutionalization, or both.

<u>Termination from Home Services Program</u>

26.     On or around March 18, 2019, one of Plaintiff Vinyard's homemaker agency caregivers told him that DRS had decided to discontinue his care and would no longer provide him with caregivers after March 22, 2019. This was the first information, formal or informal, that Plaintiff received that his services were about to be terminated.

27.     In fact, DRS had—apparently weeks earlier—decided to terminate all of Plaintiff's services in the Home Services Program. *See* Exhibit A, IDHS Final Administrative Decision at pp.1–2 (noting that issue under review was "whether DRS erred pursuant to 89 Ill.

- 6 -

Adm. Code Section 684.100(j) when it terminated Grievant's services in the HSP"); p.12

(determining that the "March 07, 2019 decision of the [DRS] that Grievant is not eligible for the

Home Services Program be reversed").

28.     Upon hearing this, Plaintiff Vinyard called Defendant Nemeth at DRS to find out

whether his services were being terminated. Defendant Nemeth confirmed that Plaintiff would

no longer receive services from the Home Services Program after March 22, 2019. Though

Plaintiff asked Defendant Nemeth to explain the termination of services, she gave no reason.

29.     Plaintiff Vinyard also asked Defendant Nemeth to reinstate his right to self-

directed care, pointing out that he could manage his own care and that he had qualified people

who were available to begin work. Defendant Nemeth said, "we can't do that," without further

explanation.

30.     Defendant Nemeth was the individual at DRS most responsible for Plaintiff

Vinyard's care. Every time Plaintiff called the DRS field office during the events of this case, as

soon as Plaintiff introduced himself, staff members immediately transferred him to speak with

Defendant Nemeth. Defendant Nemeth presented herself to Plaintiff as the person making the

final decisions regarding his case and as the point person on behalf of the agency for his case.

Plaintiff did not speak with anyone else at DRS about the facts of his situation, and it did not

appear that anyone else from DRS was authorized to speak with him.

31.     Plaintiff did not receive timely written notice of DRS's decision to discontinue

services, of his right to appeal that decision, or his right to have his services continue until an

appeal hearing could be held.

32.     After March 22, 2019, homemakers stopped coming to his home.

33.     On April 11, 2019, Plaintiff requested an administrative fair hearing to challenge DRS's discontinuation of his services and its refusal to reinstate his right to self-directed care.

34.     Despite its obligations under statutory law, regulations, and due process, DRS failed to continue Plaintiff Vinyard's services pending resolution of his appeal, and so Plaintiff remained without services provided through the Home Services Program.

35.     An Impartial Hearing Officer, weighing the evidence and testimony, issued Findings of Fact and a Recommended Decision to reverse the termination of services. The hearing officer found that any challenges DRS had in locating homemakers for Plaintiff's care did not justify termination of Plaintiff from the Home Services Program. In addition, the hearing officer also restored Plaintiff's right to self-directed care that had been revoked in 2011, finding no reason for DRS to have refused it in the first place.

36.     On November 18, 2019, the Secretary of the IDHS issued a final administrative decision adopting the Recommended Decision and reinstating the services. (Exhibit A.)

<u>Financial and Emotional Injuries Caused by Deprivation of Care</u>

37.     The sudden withdrawal of services meant that Plaintiff Vinyard was at immediate risk of physical harm and of having to move out of his home and into an institution. Plaintiff had no means of performing essential life functions, such as using the washroom or feeding himself.

38.     Due to the abrupt termination of Plaintiff's home services without notice and the absence of other support, Plaintiff's mother and daughter had to move from other states on an emergency basis to care for Plaintiff in his home. Of necessity, Plaintiff's daughter had to bring her two children with her, one of whom has disabilities and who lost critical social and educational supports he had been receiving in his home community.

39.     With the unanticipated addition of these four family members to his household, Plaintiff Vinyard suffered substantial financial hardship. Plaintiff's family was not paid for their care of Plaintiff. In addition, Plaintiff's daughter had to abandon her paid employment in her home state upon relocating to Illinois. To provide for his family while they resided with him, Plaintiff significantly depleted the very limited financial resources he had available.

40.     Plaintiff Vinyard had to pay out of pocket for all expenses necessary to support four additional members within his household, none of whom had other sources of income while having to live with him. Without limitation, these additional expenses included (a) groceries and basic living expenses for his four family members; (b) sharply higher utility bills (electric, water, gas) due to increased usage by the additional people living in his home; and (c) gas for the vehicle he owns, along with wear and tear on the vehicle, as his daughter constantly had to drive the vehicle in order to pick up groceries and other provisions for the family, get her children to and from school while they were living there, and attend to other family needs.

41.     Plaintiff Vinyard incurred costs necessary for his own care in the absence of services from DRS that would have otherwise been covered by the Home Services Program. For instance, the costs of transportation to get his own groceries and supplies now fell to him.

42.     The termination of Plaintiff Vinyard's services caused great personal hardship for Plaintiff and his family members over a period of many months. Because of having to take over his care, Plaintiff's relationships with his mother and daughter—with whom he had always been very close—became and have remained severely strained. Because of the loss of home services and the difficulties this caused, Plaintiff experienced emotional distress and humiliation.

43.     Congress provided a clear national mandate for the elimination of discrimination against individuals with disabilities when it enacted the Rehabilitation Act, the Americans with

Disabilities Act, and the Affordable Care Act. Such discrimination includes barriers to health care, full integration, independent living, and equal opportunity for persons with disabilities.

## COUNT ONE
## SECTION 504 OF THE REHABILITATION ACT (29 U.S.C. § 794)

44.     The allegations contained in the previous paragraphs are incorporated by reference. This count is solely against Defendant IDHS.

45.     Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …." 29 U.S.C. § 794.

46.     In its administration of the Home Services Program as a Medicaid waiver program, Defendant IDHS received and continues to receive Federal financial assistance.

47.     Defendant IDHS was bound by the regulations implementing Section 504 that require agencies to make their programs and services accessible by providing reasonable accommodations to individuals with disabilities. 28 C.F.R. § 41.53.

48.      As determined by DRS prior to terminating Plaintiff's services, Plaintiff was qualified to participate in the Home Services Program, as he was at risk of institutionalization without the necessary services and was otherwise able to live in his home in the community with home services.

49.     By refusing Plaintiff Vinyard's request to resume self-directed care and terminating his home services, Defendant IDHS (a) discriminated against Plaintiff Vinyard, by denying him a reasonable accommodation that would have allowed him an equal opportunity to participate in or benefit from the Home Services Program; and (b) knowingly and intentionally put Plaintiff at risk of institutionalization.

- 10 -

50.     Because Defendant IDHS knew that reinstating Plaintiff Vinyard's right to self-directed care was a reasonable accommodation that would have enabled him to participate in the Home Services Program, and nevertheless denied Plaintiff that accommodation, Defendant's discrimination was intentional and in reckless disregard of Plaintiff's federal rights.

51.     Because of Defendant IDHS's wrongful conduct, Plaintiff is entitled to compensatory damages, plus his attorney's fees, costs, and expenses under 29 U.S.C. § 794a.

**COUNT TWO**
**SECTION 1557 OF THE ACA (42 U.S.C. § 18116)**

52.     The allegations contained in the previous paragraphs are incorporated by reference. This count is solely against Defendant IDHS.

53.     The ACA mandates that: "an individual shall not, on the ground prohibited under … section 794 of title 29 [Section 504 of the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance …." 42 U.S.C. § 18116.

54.     Defendant IDHS is an entity that operates a health program or activity and that receives Federal financial assistance.

55.     Defendant IDHS is bound by the regulations implementing the ACA, 45 C.F.R. Part 92, which prohibit discrimination in the administration of any covered health program or activity. 45 C.F.R. § 92.2(a). This provision applies to individuals with disabilities as defined within Section 504 of the Rehabilitation Act. 45 C.F.R. § 92.2(b)(4).

56.     The ACA regulations require IDHS to make reasonable modifications in its administration of the Home Services Program to avoid discrimination against individuals with disabilities. 45 C.F.R. § 92.105.

57.     As determined by DRS prior to terminating Plaintiff Vinyard's services, Plaintiff was qualified to participate in the Home Services Program because he was at risk of institutionalization but with services could continue to live independently in the community.

58.     The Home Services Program is a health program or activity that is administered by Defendant IDHS. Defendant receives Federal financial assistance such that it is covered by the Affordable Care Act.

59.     By refusing Plaintiff Vinyard's request to resume self-directed care and by terminating his home services, Defendant IDHS (a) excluded him from equal participation in, denied him the benefits of, or otherwise subjected him to discrimination; (b) knowingly put Plaintiff at risk of institutionalization; and (c) failed to provide a reasonable modification as required under the implementing regulations of the Affordable Care Act.

60.     Plaintiff Vinyard is entitled to compensatory damages for Defendant IDHS's discrimination, plus reasonable attorney's fees and costs under 42 U.S.C. § 18116(a) (adopting the remedies for Section 504 by reference).

## COUNT THREE
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132)

61.     The allegations contained in the preceding paragraphs are incorporated by reference. This count is solely against Defendant IDHS.

62.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

63.     This antidiscrimination provision of Title II applies to Defendant IDHS as a state agency. *Id.* § 12131(1)(A), (B).

64.     Defendant IDHS is bound by the regulations implementing Title II of the ADA, which require that an agency make its programs and services accessible by providing reasonable accommodations to individuals with disabilities. 28 C.F.R. § 35.130(b)(7)(i).

65.     As DRS determined before terminating Plaintiff Vinyard's services, he was qualified to participate in the Home Services Program, as he was at risk of institutionalization but was nonetheless able to live independently in the community with supports.

66.     By refusing Plaintiff Vinyard's request to resume self-directed care and terminating his home services, Defendant IDHS (a) discriminated against Plaintiff by denying him a reasonable accommodation that would have allowed him an equal opportunity to participate in or benefit from the Home Services Program; and (b) knowingly and intentionally put Plaintiff at risk of institutionalization.

67.      Because of Defendant IDHS's discriminatory and intentional conduct, Plaintiff Vinyard is entitled to compensatory damages. Defendant violated Plaintiff's rights under the Fourteenth Amendment—falling within the abrogation of immunity under 42 U.S.C. § 12202—by, *inter alia*, (a) infringing on his fundamental right to live in his own home and community and not to be forced to live in an institution; (b) failing to provide procedural due process by denying Plaintiff pre-deprivation notice and a hearing before withdrawing home services; and (c) irrationally depriving Plaintiff of home services without notice or valid reason, thereby abandoning Plaintiff without essential services as would shock the conscience.

68.     Plaintiff Vinyard is also entitled to reasonable attorneys' fees, costs, and expenses under the ADA, 42 U.S.C. § 12205.

**COUNT FOUR**
**42 U.S.C. § 1983 FOR VIOLATION OF MEDICAID ACT**

69.     The allegations contained in the preceding paragraphs are incorporated by reference. This count is solely against Nemeth in her individual capacity.

70.     Beneficiaries of Medicaid must have the opportunity for a fair hearing when their claims for Medicaid benefits are denied or not acted upon with reasonable promptness. 42 U.S.C. § 1396a(a)(3).

71.     The regulations implementing the Medicaid's fair hearing provision require written notice to any beneficiary whose claim for Medicaid benefits is denied or not acted on with reasonable promptness. 42 C.F.R. §§ 431.206(b) & (c)(2), 431.220(a)(1).

72.     The notice must include (a) a statement of what action the state intends to take and the effective date of such action; (b) a clear statement of the specific reasons supporting the intended action; (c) the specific regulations that support, or the change in federal or state law that requires, the action; (d) an explanation of the individual's right to request a fair hearing; and (e) an explanation of the circumstances under which Medicaid benefits are preserved if a hearing is requested. 42 C.F.R. § 431.210.

73.     Federal regulations provide that services must continue during an appeal. 42 C.F.R. § 431.230(a). The only exception is where "(1) [i]t is determined at the hearing that the sole issue is one of Federal or State law or policy; and (2) [t]he agency promptly informs the beneficiary in writing that services are to be terminated or reduced pending the hearing decision." *Id.* Neither condition was satisfied in this case.

74.     Defendant Nemeth, the Public Service Administrator at IDHS who directly oversaw Plaintiff Vinyard's home services, violated the clearly established mandates of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(3), and its implementing regulations by failing to provide

timely and adequate notice to Plaintiff of IDHS's actions and decisions regarding a Medicaid benefit that Plaintiff received, specifically home services.

75.     Defendant Nemeth acted intentionally in violation of Plaintiff Vinyard's rights because, *inter alia*, she knew that Plaintiff required services, that he was at risk of institutionalization without the services, that services should be frozen by operation of law pending a hearing, and that services were not being provided pending Plaintiff's hearing. Defendant Nemeth for the same reasons acted in reckless or callous indifference of Plaintiff's federally protected rights under Medicaid.

76.     Thereby, Plaintiff is entitled to compensatory damages, punitive damages, and attorney's fees, costs and expenses under 42 U.S.C. §§ 1983 and 1988.

## COUNT FIVE
## 42 U.S.C. § 1983 FOR VIOLATION OF CONSTITUTIONAL DUE PROCESS

77.     The allegations contained in the preceding paragraphs are incorporated by reference. This count is solely against Defendant Nemeth in her individual capacity.

78.     The Due Process Clause of the Fourteenth Amendment of the United States Constitution bars the state from depriving a person of their property, which includes Medicaid coverage, without affording the individual advance notice and a fair opportunity to be heard.

79.     State regulations provide a process to follow, recognizing the need for pre-deprivation notice and hearing. DRS is required to provide notice to a Home Services Program participant "whenever it denies, modifies or terminates a service or services, if not mutually agreed upon …," and must issue such notice to the participant "at least 15 working days before the effective date of the action." 89 Ill. Admin. Code 510.60(b).

80.    Among other requirements, the notice must inform the participant of the option to request a hearing regarding the action by DRS, as well as the procedure for the participant to initiate the hearing process. 89 Ill. Admin. Code 510.40(a); 510.60(d).

81.    Where a participant requests a hearing regarding a modification or termination of services, absent certain exceptions not applicable to this matter, DRS must continue to provide the participant's services at the same level pending a final administrative ruling. 89 Ill. Admin. Code 510.60(e).

82.    DRS failed to provide Plaintiff Vinyard with either notice or the opportunity for a hearing, as required by law, prior to terminating his participation in the Home Services Program.

83.    Despite DRS' failure to provide Plaintiff Vinyard with notice of termination of his services or of his right to a hearing, on April 11, 2019, Plaintiff made a request for such a hearing, which IDHS accepted as timely under law.

84.    Despite its legal obligation to do so, DRS failed to maintain Plaintiff Vinyard's home services pending resolution of his appeal, and Plaintiff remained without program-sponsored care.

85.    From March 22, 2019, when DRS ceased to provide Plaintiff Vinyard with home services, until sometime after November 18, 2019, the date on which a Hearing Officer reinstated Plaintiff's services and restored his right to self-directed care, Plaintiff was deprived of services under the Home Services Program, for which he was otherwise eligible and qualified.

86.    Because of losing his services, Plaintiff Vinyard was left socially isolated, in physical danger, and at imminent risk of institutionalization.

87.    As the Hearing Officer later found that DRS had acted wrongfully in terminating Plaintiff Vinyard's home services as well as in denying him the right to self-directed care,

Plaintiff presumptively would not have lost his services had he received a pre-deprivation hearing as required under law.

88.     Defendant Nemeth, who personally authorized the DRS actions above, violated Plaintiff's right to procedural due process under the Fourteenth Amendment by failing to provide pre-deprivation notice.

89.     Defendant Nemeth acted intentionally in violation of Plaintiff Vinyard's due process rights because, *inter alia*, she knew that Plaintiff required services, that he was at risk of institutionalization without the services, that services should be frozen by operation of law pending a hearing, and that services were not being provided pending Plaintiff's hearing. Defendant Nemeth for the same reasons acted in reckless or callous indifference of Plaintiff's federally protected rights to procedural due process.

90.     Thereby, Plaintiff is entitled to compensatory damages, punitive damages, and attorney's fees, costs and expenses under 42 U.S.C. §§ 1983 and 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)     Enter judgment in favor of Plaintiff;

(b)     Enter a declaratory judgment of Plaintiff's rights;

(c)     Award compensatory or, alternatively, nominal damages, plus interest and—as against Defendant Nemeth—punitive damages;

(d)     Award Plaintiff the cost of this lawsuit and reasonable attorneys' fees, costs, and expenses pursuant to 29 U.S.C. § 794a, 42 U.S.C. § 12205, and 42 U.S.C. § 1988; and

(e)     Award such other relief as may be just, equitable and appropriate.

## JURY DEMAND

PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES TRIABLE BY JURY.

Respectfully submitted,

*/s/ Paul W. Mollica*
Paul W. Mollica (Bar No. 6194415)
Laura J. Miller (Bar No. 6202721)
Andrew Webb (Bar No. 6307277)
Equip for Equality
20 N. Michigan Ave., Ste. 300
Chicago, Illinois 60602
Telephone: office 312-341-0022
direct 312-895-7350

ATTORNEYS FOR PLAINTIFF